`UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

BETHANY DOLDER,

       *Plaintiff*,

CASE NO. 1:15-cv-12072

DISTRICT JUDGE THOMAS L. LUDINGTON

*v.*

MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

       *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGEMENT
(Docs. 15, 16)

## I.  RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Dolder's Motion for Summary Judgment (Doc. 15) be **DENIED** and that the Commissioner's Motion for Summary Judgment (Doc. 16) be **GRANTED**.

## II.  REPORT

### A.  Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claims for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. §§ 401-34 and Supplemental Security Income ("SSI"). (Doc. 3.) The matter is currently before the Court on cross-motions for summary judgment. (Docs. 15, 16.)

On April 8, 2009, Plaintiff filed the present claim for SSI and DIB, alleging that she became disabled on July 11, 2008. (Tr. 414, 150-62.) Plaintiff's initial claim was denied on September 9, 2009 (Tr. 51-52), and Plaintiff requested a hearing. (Tr. 57.) She testified before Administrative Law Judge ("ALJ") Andrew G. Sloss on June 27, 2011, who considered the application for benefits *de novo*. (Tr. 33-50.) On August 2, 2011, the ALJ denied her claim. (Tr. 20-28.) The Appeals Council declined to review this decision, (Tr. 1-6), and Plaintiff sought review in this court. On June 5, 2013, this Court issued a decision remanding the case to the Agency for further proceedings. (Tr. 494-532.) The ALJ held a new hearing on January 27, 2014, (Tr. 435-50,) and issued a new decision finding that Plaintiff was not disabled on January 31, 2014. (Tr. 414-28.) The ALJ's decision became the Commissioner's final decision on October 28, 2014, when the Appeals council denied Plaintiff's request for review. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004).

On June 8, 2015, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision. (Pl. compl., Doc. 1.) Plaintiff filed a motion for summary judgment and supporting brief on March 18, 2015. (Doc. 15.) Defendant filed a cross motion for summary judgment on November 10, 2015. (Doc. 16.) Plaintiff filed a response on December 14, 2015. (Doc. 17.) Accordingly, pursuant to E.D. Mich. LR 7.1(f)(1), these motions are ready for report and recommendation without oral argument.

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standards or has

made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health and Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently, and even if substantial evidence also supports the opposite conclusion." *Id.* (internal citations omitted).

### C.    Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003); *see also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

4

### D.    ALJ Findings

Following the five step analysis, the ALJ found Plaintiff was not disabled under the Act. At step one, the ALJ found that Plaintiff met the insured status requirements through March 31, 2015, and had not engaged in substantial gainful activity since the alleged onset date, July 11, 2008. (Tr. 417.) At step two, the ALJ found Plaintiff had the following severe impairments: "meleda disease; arthritis/psoriatic arthritis; depression/adjustment disorder." (*Id.*) At step three, the ALJ found that Plaintiff's combination of impairments did not meet or equal one of the listings in the regulations. (Tr. 420) The ALJ then found that Dolder had the residual functional capacity ("RFC") to perform light work except that

> The claimant must be able to sit or stand alternatively at will. The claimant can only occasionally climb ramps/stairs or balance. The claimant is also limited to frequent handling and fingering, but no feeling. In addition, the claimant is limited to unskilled work as defined by the regulations, with only occasional changes in the work setting and only occasional interaction with the public.

(Tr. at 423.) At step four, the ALJ found that Plaintiff is unable to perform any past relevant work. (Tr. 426.) At step five, the ALJ found that a significant number of jobs existed which Dolder could perform despite her limitations. (Tr. 427.) The ALJ also found that Plaintiff was 29 and therefore a younger individual (age 18-49) as of the alleged onset date. (*Id.*) He also found that Plaintiff has at least a high school education and is able to communicate in English. (*Id.*) As a result, the ALJ found Plaintiff is not disabled under the Act. (Tr. 428.)

### E.    Administrative Record

#### 1.    Medical Records

Prior to the alleged onset date, Plaintiff was treated by Wurster Frederick, D.O. for minor car accident injuries and bilateral hand pain. (Tr. 257-77.)

5

Plaintiff was treated at McLaren Regional Medical Center Behavioral Health Services Clinic from September 2007 through April 16, 2009. (Tr. 295-332.) Plaintiff presented with problems sleeping, decreased appetite, and family issues. (Tr. 297.) It was noted that Plaintiff is "[d]depressed, angry, overwhelmed, confused, worried, low self worth/reflection, frustrated, scared, [and] fatigue[d]." (*Id.*) She was diagnosed with Adjustment Reaction (DSM 309.28) and a global assessment of functioning ("GAF") of 55. (Tr. 301.) Plaintiff attended therapy focused on problem resolution through April 2009, and continued to feel depressed, worried, overwhelmed, and frustrated and struggle with family and financial issues. (Tr. 303-32.)

On October 7, 2008, Kimball Silverton, D.O. treated plaintiff for lesions on Plaintiff's hands and feet, reportedly present since birth. (Tr. 293.) Dr. Silverton explained that "[w]hile not causing any abnormal symptoms she does have a thickened palmar and plantar aspects of her hands with a well demarcated area along the lateral aspects. This is consistent with unna-thost palmoplamter keratoderma [meleda disease], this is an autosominal dominate trait." (*Id.*) He noted dryness, cracking, and peeling and concluded that this is life-long condition but that the areas may be exfoliated with topical treatment. (Tr. 293-94.) In October and November 2009, Dr. Silverton noted abnormalities on Plaintiff's scalp, chest, back, abdomen, and bilateral upper and lower extensions. (Tr. 380-81.) He indicated positive tenderness and mild pain on Plaintiff's "R. post. ear. " (Tr. 381.) He diagnosed epicyst and psoriasis vulgaris. (Tr. 380-81.)

In October 2009, Ali Karrar, M.D. a rheumatologist treated Plaintiff. (Tr. 365-79.) Plaintiff complained of bilateral ankle, foot, hand, hip and wrist pain, and that she experienced "'gelling' after inactivity, swelling, pain and morning stiffness lasting for hours. (Tr. 365.) She

6

indicated constant burning and throbbing pain that worsened with activity and ranged from 5-8 on a scale of 1-10 with 10 being the worst. (Tr. 365.) On exam, she had a minimally antalgic gain but was ambulatory without assistance. (Tr. 365.) Evidence of tenderness was found in the dorsal aspect of Plaintiffs left second, third, fourth, and fifth MCP joints; bilateral second, third, fourth, and fifth PIP joints; right hand; right fifth, fourth, and second proximal phalanx; and left wrist. (Tr. 365.) The impression was multiple sites of osteoarthritis, psoriasis,[1] and psoriatic arthritis.[2] (Tr. 366.) During follow up in December 2009 and March 2010, Plaintiff's symptoms remained largely the same. (Tr. 367, 369.) ANA testing was negative (Tr. 368), and an x-ray of the wrists was normal. (Tr. 379.) Plaintiff was also told to exercise. (Tr. 368.)

In August 2010, Plaintiff began treatment with Dr. Jessica Glenn-Beatty at Infinity Primary Care. (Tr. 675.) Plaintiff reported swelling of her left ankle which began a week and a half prior to her visit when she stepped of a platform at work. (*Id.*) X-rays of the ankle were negative. (*Id.*) Plaintiff also reported a history of rheumatoid arthritis in her hands, describing intermittent, throbbing pain in her hands that is aggravated by activity and relieved by rest. (Tr. 675.) Examination revealed gait disturbance and paresthesia; she was also positive for bone/joint symptoms. (Tr. 676-77.) A skin lesion was noted on her face as well as "palpable lesion(s) found on hands and feet, palmar, Bilateral, yellow in color, thickened skin, and has a localized distribution. Status is stable." (Tr. 677.) On foot/ankle exam her gait was antalgic on the left side, she had tenderness in the left ankle with positive midfoot compression, mild

---

[1] Psoriasis is "a chronic skin disease characterized by circumscribed red patches covered with white scales." *Psoriasis*, MERRIAM WEBSTER, http://c.merriam-webster.com/medlineplus/psoriasis (last visited May 18, 2016).

[2] Psoriatic arthritis is "a severe form of arthritis accompanied by inflammation, psoriasis of the skin or nails, and a negative test for rheumatoid factor." *Psoriatic arthritis*, MERRIAM WEBSTER, http://c.merriam-webster.com/medlineplus/psoriatic%20arthritis (last visited May 18, 2016.)

ecchymosis, and mild swelling. (Tr. 677-78.) Dr. Glenn-Beatty diagnosed plaintiff with an ankle sprain and referred her to a rheumatologist. (Tr. 675, 679.) By September Plaintiff's ankle improved, her gait was normal, but she continued to have tenderness and positive midfoot compression. (Tr. 680-83.)

On December 14, 2010, Plaintiff was treated for psoriasis flare on her lower legs, back, and scalp. (Tr. 684.) Plaintiff's treatment options were limited by insurance and pregnancy. (*Id.*) Plaintiff indicated that Dr. Dowd, a rheumatologist "thinks she may have an element of fibromyalgia or vitamin D deficiency." (*Id.*) Dr. Glenn-Beatty listed Meleda disease[3] and fibromyalgia as chronic problems and noted on examination that Plaintiff was positive for rash, bone/joint symptoms, and myalgia. (Tr. 684-85.)

On December 17, 2010, Plaintiff presented to the emergency room with moderate pain in the upper back and chest after a car accident. (Tr. 389.) Examination revealed, moderate thoracic diffuse and tenderness and normal range of motion and strength. (Tr. 390.) Plaintiff was alert and oriented to person, place, time and situation, cooperative, demonstrated normal judgment, and had appropriate mood and affect. (*Id.*) X-rays of the pelvis and chest were negative revealing "[n]o signs of acute traumatic injury." (*Id.*) Plaintiff followed up with Dr. Glenn-Beatty complaining of neck, low-back, and thoracic spine pain, and a hip contusion on December 21, 2011. (Tr. 688.) She reported nausea, vomiting, headache, dizziness, gait disturbance, back pain, myalgia, and neck stiffness. (Tr. 689.) Examination revealed thoracic,

---

[3] "Meleda disease is an extremely rare inherited skin disorder characterized by the slowly progressive development of dry, thick patches of skin on the palms of the hands and soles of the feet (palmoplantar hyperkeratosis). Affected skin may be unusually red (erythema) and become abnormally thick and scaly (symmetrical cornification)." *Meleda Disease*, NORD, http://rarediseases.org/rare-diseases/meleda-disease/ (last visited May 18, 2016).

cervical and lumbar muscle spasm, tenderness, paravertebral muscle spasm, and tenderness. (Tr. 691.) She had "active painful range of motion" and her gait was antalgic. (*Id.*) During a follow up in January 2011, improvement was noted, but it was also noted that "[h]ealing is going to be slower secondary to rheumatological issues." (Tr. 694.) Plaintiff reported continued "neck pain and stiffness, difficulty bending over because of pain and stiffness in her upper and lower back, and pain in her left hip." (Tr. 695.) She continued to exhibit reduced range of motion, tenderness, muscle spasm, and antalgic gait. (Tr. 696-97.) On January, 18, 2011, Plaintiff continued to improve but still complained of pain. (Tr. 699.) Skin disorder, psoriasis, fibromyalgia, and arthropathy psoriatic were listed as chronic problems and a review of her systems indicated that she was positive for fatigue, rash, back pain, bone/joint symptoms, myalgia, neck stiffness, and rheumatologic manifestations. (Tr. 700.) Plaintiff continued to have posterior and left thoracic tenderness, paravertebral muscle spasm, and restricted range of motion. (Tr. 701.) "[P]atchy areas of erythematous scaling" were noted on lumbar exam, and her gait was slow and stiff. (Tr. 701-02.)

On February 15, 2011, another physician at Infinity Primary Care treated Plaintiff for an occipital headache that began a month prior and continued neck pain. (Tr. 704.) She described her headache as "dull, sharp and throbbing," and associated symptoms were noted as "dizziness, nausea, phonophobia, photophobia, and stiff neck." (*Id.*) Review of systems was positive for photophobia, nausea, headache, tension headaches, back pain, bone/joint symptoms, myalgia, and neck stiffness. (Tr. 705-06.) She continued to exhibit reduced range of motion in the cervical thoracic, and lumbar spine with muscle spasm and tenderness. (Tr. 706.)

Physical therapy treatment notes from February 22, 2011, note that seven body regions were treated with good relief. (Tr. 709.) Patient reported that her symptoms are "aggravated by bending, changing positions, daily activities, extension, flexion, rolling over in bed and twisting. (Tr. 709-10.) Heat, physical therapy, and stretching provided some relief. (Tr. 710.) Review of symptoms was positive for gait disturbance, headache, back pain, and myalgia. (*Id.*) Follow up notes from February through April indicate that Plaintiff's low-back pain and neck pain improved. (Tr. 712-22.)

In June 2011, Dr. Glenn-Beatty completed an assessment of Plaintiff's functionality, indicating that she had treated Plaintiff eleven times from August 30, 2010 to April, 12, 2011. (Tr. 382.) She diagnosed Plaintiff with psoriatic arthritis, psoriasis, fibromyalgia, and Meleda disease. (*Id.*) The signs that led to this diagnosis were "decreased range of motion, muscle spasms, joint swelling, muscle tenderness, [and] thickening of skin on palmar surface." (Tr. 382.) She found that Plaintiff suffers from moderately severe pain and moderate fatigue/weakness. (*Id.*) She opined that Plaintiff would not be able to complete sedentary or light work, and that her impairment had been present for "8-9 years" and is indefinite. (Tr. 384-85.) She also indicated that Plaintiff suffers from depression. (Tr. 385.)

Plaintiff was treated for a psoriasis flare on January 15, 2013, that she reported had lasted about one and a half months. (Tr. 668-74.) She described the pain as burning and itching. (Tr. 668.) She had a score of six on a screening for depression, and was referred for counseling. (Tr. 670.)

### 2. Consultative Examinations

Plaintiff met with Tama D. Abel M.D. on July 25, 2009, for a consultative physical examination, for which the chief complaints were rheumatoid arthritis, Meleda disease, and depression. (Tr. 334.) Plaintiff reported that Vaseline has helped her Meleda disease symptoms; she has "diminished feeling in the pinky and ring finger of her right hand as a result of a right elbow injury;" "[s]he has a tendency to drop things and finds it hard to type and write;" "her ankles tend to give out and caused her to fall just a few weeks ago;" and she "is independent with her activities of daily living." (*Id.*) Dr. Abel noted that plaintiff was not in obvious distress, and her "[a]ffect, effort, and dress were appropriate." (Tr. 335.) Her "immediate, recent, and remote memory appeared intact with normal concentration . . . [and her] insight and judgment appeared appropriate." (*Id.*) Acne was concealed on her face with makeup, and she had "[t]hickened skin with a calloused appearance and feel . . . on the palmar aspect of her hands and plantar aspect of her feet. These areas were non-tender to palpation." (*Id.*) Dr. Abel found

> no evidence of joint laxity, crepitus, or effusion. Full fist with full grip bilaterally was present with adequate pincher grasp. Dexterity appeared unimpaired. The patient was able to tie a shoelace, button clothing, and pick up a dime. Tenderness to palpation was noted over many joints, which were not swollen. Her hands were non-tender to palpation. The patient had no difficulty getting on and off the examination table, no difficulty heel and toe walking, no difficulty squatting and arising, no difficulty balancing, and no difficulty hopping.

(*Id.*) Plaintiff had normal range of motion throughout. (Tr. 335-37.) Dr. Abel concluded that Plaintiff has palmoplantar hyperkeratosis. (Tr. 338.) He noted that "digital dexterity loss was not appreciated. The patient did not require use of assistive device to ambulate." (Tr. 338.)

In August 2009, Mathew Dickson, Ph.D. completed a psychological consultative examination. (Tr. 351.) Plaintiff reported a history of depression since she was a teenager,

11

feelings of anxiety, difficulty sleeping, excessive sleeping, and a history of physical abuse. (*Id.*) She reported that she generally gets along with others, but avoids social interactions and spends some time with friends and family members. (Tr. 352.) Her interactions with former co-workers were "satisfactory." (*Id.*) Dr. Dickson found that Plaintiff did not "seem to exaggerate or minimize symptoms, and she had low self esteem." (*Id.*) Her affect was appropriate, and her emotional state appeared to be depressed. (Tr. 353.) Dr. Dickson concluded that "[Plaintiff's] mental abilities to understand, remember and carryout instructions are not impaired. [Plaintiff's] abilities to respond appropriately to co-workers and supervision and to adapt to change and stress in the workplace are moderately impaired. Overall, based on today's exam . . . [Plaintiff's] psychological condition would moderately impair her ability to perform work related activities." (Tr. 354.) He diagnosed Plaintiff with mild major depressive disorder and assessed a GAF score at 57. (*Id.*)

On September 4, 2009, state agency consultant Rom Kriauciunas, Ph.D. completed a psychiatric review from July 2008 through September 2009. (Tr. 278-91.) His notes indicate that Plaintiff could perform "simple, low-stress, unskilled work during the period under review." (Tr. 290.) He noted that Plaintiff does not socialize but can go grocery shopping, concentrate, follow instructions, and get along with others. (*Id.*) He opined that Plaintiff was "able to do unskilled work. Is able to do simple tasks on a sustained basis . . . is moderately limited in [her] ability to understand, remember, carry out detailed instructions, to maintain attention and concentration for extended periods . . . [and] in [her] ability to interact with the general public, and to respond to changes at work." (Tr. 357.)

A physical residual functional capacity assessment was completed on October 29, 2013 by state agency physician Donald H. Kuiper, M.D. (Tr. 723-30.) Dr. Kuiper opined that plaintiff's Meleda disease and psoriasis limited her to occasionally lifting twenty pounds and frequently lifting 10 pounds. (Tr. 724.) She can stand and/or walk for a total of six hours in an eight hour work day, but must periodically sit or stand to relieve pain or discomfort. (*Id.*) He indicated that fingering, feeling and handling was limited due to thickened skin on her palm. (Tr. 726.) On multiple occasions he noted "ALJ opinion adopted" when asked to explain or support his conclusion. (Tr. 724, 728-29.)

### 3.    Function Report

On May 14, 2009, Plaintiff completed a function report, reporting that she gets her children ready for school, does dishes, cooks meals, watches TV, does her own homework, and does 1-2 loads of laundry daily. (Tr. 210-11.) She is able to complete personal care tasks without a problem. (Tr. 211.) She spends fifteen minutes to an hour preparing meals and needs assistance with some tasks such as peeling and mashing potatoes. (Tr. 212.) She vacuums, dusts and sweeps, grocery shops, and drives a car but needs assistance carrying heavy things. (Tr. 212-13.) She is able to cross-stitch, crochet, and latch hook a couple of times a week, watches TV, reads, and listens to music daily. (Tr. 214.) She speaks on the phone two or three times a day, speaks to people in person once a week and attends college. (*Id.*) She wrote "I have isolated myself a lot from friends and family. I get tired and irritable more frequently." (Tr. 215.) She also reported that she has no issues following instructions, no problems with authority figures, but she does not handle stress well and breaks out in psoriasis. (Tr. 215-16.) She listed a number of limitations in her abilities including only lifting 10-20 pounds; limited

13

squatting, bending, and kneeling; standing and sitting only 20-30 minutes at a time; and minimal use of her hands including writing and typing. (Tr. 215.)

### 4.     Plaintiff's Hearing Testimony

On June 26, 2011, Plaintiff testified that she stopped working because of pain in her back, hands, and feet, and limited range of motion in her neck. (Tr. 36.) She has difficulty bending over, and grasping things, and she has difficulty socializing because of depression. (Tr. 37-38.) She testified that she has not had medical treatment recently because she does not have healthcare and has medical bill debt. (Tr. 38.) She suffers from frequent fatigue which she believes is from her arthritis and the soles of her feet and palms are blistery and "peely" from Meleda disease. (Tr. 38-39.) Currently her feet are sore and bleed when she walks. (Tr. 39) She washes dishes, vacuums sometimes, watches TV and reads, but she often needs to take a break from these activities to either stand or sit down, and she no longer grocery shops. (Tr. 39-40.) She cannot sit or stand for a half hour to an hour because of pain in her feet and back and stiffness. (Tr. 41.) She also has issues washing, drying, and brushing her hair; tying her shoes; and putting on socks. (Tr. 44.) She has limited feeling in her hands and feet. (Tr. 45-46.)

On January 27, 2014, Plaintiff testified that she has insurance but must be in Texas to receive treatment and has a high deductible that she can't afford. (Tr. 439.) She is currently taking an online class and gave up custody of her children because she cannot care for them properly. (Tr. 439-40.) She can't sit or stand for long periods of time and clothing can irritate her skin. (Tr. 440-41, 444.) She still has issues gripping things and her psoriasis flares last two weeks to four months. (442-43.) She has difficulty sleeping and often naps during the day, and her pain is between a five and eight typically. (Tr. 444-45.)

14

### 5.   Vocational Expert Testimony

On June 26 2011, the ALJ posed the following hypothetical to the vocational expert ("VE"):

> I'd like you to assume a person of the Claimant's age and education and past work, is able to perform light work except that she can occasionally climb ramps or stairs and balance. She is limited to frequent handling and fingering and no feeling. She must be allowed to sit or stand alternatively at will. Her psychological symptoms limit her to unskilled work as defined by the regulations, and work that has only occasional changes in the work setting and that involves only occasional interaction with the general public.

(Tr. 446-47.) The VE testified that such a person could not perform Plaintiff's past work but testified that there would be sorter positions, (80,000 jobs nationally) inspection positions, (80,000 jobs nationally) and bench assembly positions (60,000 jobs nationally) that could be performed." (Tr. 447.)

### F.   Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, but the only relevant distinction for present purposes is between "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis

15

and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d);

SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's residual functional capacity ("RFC"), and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL

180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner*, 375 F.3d at 390.

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)   The type, dosage, effectiveness, and side effects of any medication . . .
taken to alleviate . . . pain or other symptoms;

(v)   Treatment, other than medication, . . . received for relief of . . . pain;

(vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to step five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

**G.    Analysis**

Plaintiff contends that substantial evidence does not support the RFC assessment because the ALJ failed to (1) properly incorporate the opinions of Drs. Dickson and Kriaunciunas; (2) properly evaluate the opinion of Plaintiff's treating physician; and (3) properly assess Plaintiff's credibility. She also argues that the ALJ failed to establish that there

is other work in the national economy that Plaintiff can perform. I will address each of these arguments in turn.

### 1.     Opinions of Drs. Dickson and Kriaunciunas

Defendant initially argues that Plaintiff is barred from litigating whether the ALJ's mental RFC finding adequately incorporates the opinions of Drs. Dickson and Kriauciunas under the doctrine of res judicata. Collateral estoppel is the branch of *res judicata* applied in this context. As the Third Circuit explained, *res judicata* formally "consists of two preclusion concepts: issue preclusion and claim preclusion." *Purter v. Heckler*, 771 F.2d 682, 689 n.5 (3d 1985); *see also Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998) (Posner, J.) (discussing the "collateral estoppel branch of res judicata" in social security cases). Claim preclusion prevents renewing a judgment on the same cause of action; issue preclusion, or collateral estoppel is less expansive: "foreclosing relitigation on all matters that were actually and necessarily determined in a prior suit." *Purter*, 771 F.2d at 689 n.5.

The *res judicata* effect of past ALJ decisions is actually a form of collateral estoppel precluding reconsideration of discrete factual findings and issues. *See Brewster v. Barnhart*, 145 F. App'x 542, 546 (6th Cir. 2005) ("This Court will apply collateral estoppel to preclude reconsideration by a subsequent ALJ of factual findings that have already been decided by a prior ALJ when there are no changed circumstances requiring review."). The Commissioner's internal guide explains the different issues and factual findings precluded by *res judicata* under *Drummond*. *Soc. Sec. Admin., Hearings, Appeals, and Litigation Law Manual*, § I-5-4-62, 1999 WL 33615029, at *8-9 (Dec. 30, 1999). These include the RFC and various other findings along the sequential evaluation process, such as "whether a claimant's work activity

20

constitutes substantial gainful activity," whether she has a severe impairment or combination of impairments, or whether she meets or equals a listing. *Id.*

Here, the Court rejected Plaintiff's argument that the ALJ erred in assessing Plaintiff's mental RFC in the initial appeal of the ALJ's decision (Tr. 527-28). However, the court remanded the claim so that additional medical records could be submitted and an opinion on medical equivalence could be obtained. (Tr. 527.) Thereafter, the ALJ held a second hearing and subsequently issued a new RFC and decision. (Tr. 465-68.) Thus I find that the issue of whether the ALJ erred in assessing plaintiff's mental RFC in the second opinion is a different issue than the one previously litigated. Additionally, the courts prior finding that the ALJ did not err was not necessary to the previous judgment because the claim was remanded for further proceedings on other grounds. I will therefore address the merits of this claim.

Plaintiff contends that the ALJ erred by failing to include limitations in the RFC on Plaintiff's ability to respond to co-workers and supervision and adapt to stress in the workplace. (Doc. 15, at 15.) Plaintiff argues that even though the ALJ gave great weight to the consultative opinions of Drs. Dickson and Kriauciunas he failed to adequately incorporate Dr. Dickson's opinion that Plaintiff is moderately limited in each of these areas, (Tr. 420) and Dr. Kriauciunas' opinion that Plaintiff is limited to "simple, low-stress, unskilled work." (Tr. 290.)

Plaintiff urges the court to find that this error was not harmless, and directs the court to *Pfeiffer v. Astrue*, 576 F. Supp. 2d 956. 962 (W.D. Wis. 2008) for authority that "all competitive work, even unskilled work, requires the ability to respond appropriately to supervision[.]" *See also* SSR96-9p, 1996 SSR LEXIS 6, at *25-26 ("A substantial loss of ability to" "[r]espond[] appropriately to supervision, co-workers and usual work situations" or

21

"[d]eal[] with changes in a routine work setting" on a sustained basis . . . will substantially erode the unskilled sedentary occupation base and would justify a finding of disability."); SSR 85-15, 1985 WL 56857, at *4 (same). Plaintiff further asserts:

> It is recognized that the law judge imposed a limitation to occasional contact with the public. That, however, does not account for a limited ability to deal with supervisors and co-workers, as these interactions are distinct from contact with the public. . . . Consequently, the limitation on contact with the public does not remedy the deficiency in considering whether the plaintiff has limitations in dealing with supervisors and co-workers.

*Lloyd v. Astrue*, No. 8:11-CV-2257-T-33TGW, 2012 WL 4865401, at *4 (M.D. Fla. Sept. 20, 2012). Finally, Plaintiff contends that the ALJ's failure to limit Plaintiff to "simple" or "low-stress" work is not harmless error because the VE testified that the jobs he listed required more than simple one or two-step processes. (Tr. 448.)

With regard to Dr. Dickerson's opinion that Plaintiff is moderately limited in the ability to respond to co-workers and supervision, Defendant admits that the ALJ failed to specifically discuss the weight assigned to this opinion or his reasons for not including these limitation in the RFC. (Doc. 16, at 13.) However, Defendant contends that this error is harmless because the ALJ supported and explained his decision by pointing out that Plaintiff "denied previous problems with coworkers or supervisors." (Tr. 425.) Specifically, Plaintiff wrote in her function report that she has "no problems with authority figures," can follow instructions fine, and has never been fired or laid off because of issues getting along with others. (Tr. 215-16.) She also reported that interactions with former co-workers were satisfactory in her assessment with Dr. Dickerson. (Tr. 352.)

"While it might be ideal for an ALJ to articulate his reasons for crediting or discrediting each medical opinion, it is well settled that 'an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" *Kornecky v. Comm. of Soc. Sec.*, 167 Fed. App'x 496, 507-08 (6th Cir. 2006) (citing *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)). Given that Dr. Dickerson was merely an examining physician; his opinion was not entitled to the presumptive weight given to that of a treating source. Thus I suggest that the ALJ's finding that Plaintiff denied issues with co-workers and supervisors provided sufficient reason for deciding not to include a limitation on Plaintiff's ability to respond to co-workers and supervision. *See Conley v. Comm. of Soc. Sec.*, No. 13-cv-13072, 2015 WL 404229, at * 14 (E.D. Mich. Jan. 29, 2015) ("[A] finding of harmless error, at most, is particularly advisable given that the ALJ's rationale for the non-disability finding is well supported and explained.").

With regard to Dr. Dickerson's and Dr. Kriauciunuas' limitations pertaining to stress, the ALJ again failed to discuss the weight assigned to these opinions. However, I suggest that this error is harmless because the ALJ accounted for stress in the RFC assessment by limiting Plaintiff to "unskilled work . . . with only occasional changes in the work setting . . . ." (Tr. 423.) The ALJ explained further in the opinion that "due to physical symptoms and recurrent depression, the claimant should be limited to unskilled work, with only occasional changes in the work setting; the claimant is clearly capable of performing simple mental tasks independently, though she does appear to react to sudden stress of life changes with increased depression (if only temporarily)." (Tr. 425-26.) This is consistent with Dr. Kriauciunas reasoning that Plaintiff "is able to do unskilled work. Is able to do simple tasks on a sustained

23

basis . . . [and] is moderately limited in [her] ability to interact with the general public, and respond to work changes." (Tr. 357.)

### 2.      Dr. Glenn-Beatty's Opinion

In June 2011, Dr. Glenn-Beatty opined that Plaintiff was unable to complete even sedentary work, primarily due to diffuse pain, joint stiffness/swelling, and fatigue. (Tr. 382, 384-85.) In the first ALJ decision, the ALJ assigned little weight to Dr. Glenn-Beatty's opinion, and the Court remanded the case to "obtain Dr. Glenn Beatty's treatment notes and opinion" in order to evaluate the ALJ's decision. (Tr. 520.) On remand the ALJ, after reviewing Dr. Glenn-Beatty's treatment notes, once again assigned little weight to Glenn-Beatty's opinion explaining:

> It is noted that recently submitted medical records confirm that the claimant was examined by Dr. Glenn-Beatty in August 2010 (when care was established with this provider, for ankle sprain and rheumatoid arthritis), September 2010 (for ankle pain follow-up and for family planning advice), December 2010 (for psoriasis flare up only), in later December 2010 (for follow-up neck and back pain and hip contusion after her motor vehicle accident), and twice in January 2011 (for follow-up of her accident injuries). There is no evidence of other examinations by Dr. Glenn-Beatty after January 2011. With the exception of examinations after the car accident, the record does not reflect the presence of the serious physical symptoms of joint swelling, stiffness, pain, and fatigue cited by Dr. Glenn-Beatty in her statement. Again, Dr. Glenn-Beatty appears primarily to have provided care for sudden and temporary conditions: an ankle injury a psoriasis flare, and injuries after a car accident. There is no clinical evidence of permanent or persistent physical deficits observed in a clinical setting which correlate with the serious work-related limitations suggested by Dr. Glenn-Beatty. Her conclusion is also inconsistent with the clinical observations made previously by a rheumatologist and by an independent doctor. In short, Dr. Glenn-Beatty's opinion is inconsistent with the evidence in general and does not appear to bear logical relation to her own treatment notes.

(Tr. 426.)

Plaintiff argues that substantial evidence does not support the ALJ's findings. First, she argues that Plaintiff's treatment with Dr. Glenn-Beatty was not "sudden and temporary" and therefore the notes support Dr. Glenn-Beatty's opinion. (Doc. 15, at 19-20.) She points out that in August 2010 Plaintiff was treated for lesions and rheumatoid arthritis in addition to an ankle sprain. (*Id.*) Plaintiff was positive for gait disturbance, paresthesia, lesions on her hands and feet, and bone/joint symptoms. (*Id.*) During treatment for a psoriasis flare in December, Plaintiff reported ongoing fibromyalgia and vitamin D testing and the following chronic problems were recorded: skin disorders, Meleda disease, fibromyositis, and fibromyalgia. (*Id.*) Follow-up notes indicate that Dr. Glenn-Beatty continued to examine and diagnosis these impairments as well as psoriasis and psoriatic arthropathy. (*Id.* at 20.) Finally, in January 2011 Dr. Glenn-Beatty found that Plaintiff "was positive for fatigue, rash, back pain, bone/joint symptoms, myalgia, neck stiffness, and rheumatological manifestations." (*Id.* (citing Tr. 700).) Her gait was also slow and stiff. (*Id.*)

Second, Plaintiff contends that Dr. Glenn-Beatty's findings are consistent with the other medical records. (Doc. 15, at 20.) Dr. Silverton treated Plaintiff for lesions in 2008 and 2009 finding lesions on her hands and feet as well as her scalp, head, face, neck, chest, back, abdomen, and upper and lower extremities. (*Id.*) Dr. Karrar, a rheumatologist diagnosed multiple sites of osteoarthritis, psoriasis, and psoriatic arthritis. (*Id.* at 21.) Dr. Abel noted thickened skin on Plaintiff's hands and feet that was non-tender to palpation, tenderness to palpation over many joints which were not swollen, and decreased

sensation to light touch in the fourth and fifth fingers of Plaintiff's right hand. (*Id.* (citing Tr. 337).)

However, as Defendant points out, the evidence identified by Plaintiff is not sufficient because substantial evidence also supports the ALJ's decision. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) ("[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ.") First, substantial evidence supports the ALJ's conclusion that Dr. Glenn-Beatty only treated Plaintiff for sudden and temporary conditions. Plaintiff first saw Dr. Glenn-Beatty for an ankle sprain in August 2010, which had improved by September when she also received family planning advice and reported the opinion of a rheumatologist. (Tr. 675, 679-83.) By September, Plaintiff had normal gait, full strength in her lower extremities, normal range of motion of the ankles and no neurovascular abnormalities. (Tr. 681-82.) Plaintiff next saw Dr. Glenn-Beatty in December for treatment of a psoriasis flare. (Tr. 684.) The remaining visits in December and January were for treatment of neck, hip, back, and thoracic spine pain which resulted from a car accident. (Tr. 688-708.) The records indicate that these symptoms consistently improved with each visit and during physical therapy. (*See, e.g.*, Tr. 694, 699, 704, 713, 717, 720.) By April 2011, Plaintiff reported that her pain was good until it was aggravated a week prior to her appointment. (Tr. 720.) Although psoriasis, psoriatic arthropathy, skin disorders, and fibromyalgia are consistently listed as chronic problems, substantial evidence supports the ALJ's conclusion that Dr. Glenn-Beatty did not

26

consistently treat these impairments, but rather treated temporary, sudden conditions: an ankle sprain, a psoriasis flare, and injuries from a car accident.

Second, substantial evidence supports the ALJ's conclusion that Dr. Glenn-Beatty's findings are inconsistent with the medical record. As Plaintiff points out Dr. Karrer, a rheumatologist, noted minimal antalgic gait, some joint tenderness and swelling, psoriatic patches, and fatigue. (Tr. 365, 367.) He diagnosed osteoarthritis and psoriatic arthritis; however he advised Plaintiff to exercise, and concluded that she could walk without ambulatory assistance. (Tr. 368.) Dr. Abel did note thickened skin on Plaintiff's hands and feet, tenderness to palpation over many joints which were not swollen, and decreased sensation to light touch in the fourth and fifth fingers of Plaintiff's right hand. (Tr. 335-37.) However he found "no evidence of joint laxity, crepitus, or effusion;" no loss of dexterity; normal range of motion and strength; normal gait without the use of an assistive device; and no difficulty getting on and off an exam table, squatting, rising, balancing, walking, or picking up a dime. (*Id.* at 335-36.) Dr. Silverton, treated plaintiff for lesions primarily on her hands and feet, and found that they could be exfoliated with topical treatment. (Tr. 293-94.) Moreover, the ALJ accounted for Plaintiff's Meleda disease in the RFC by limiting Plaintiff "to frequent handling and fingering but no feeling." (Tr. 380-81, 423.) Thus I suggest that substantial evidence supports that ALJ's RFC assessment.

### 3.    Credibility Assessment

Plaintiff contends that the ALJ improperly assessed Plaintiff's credibility by failing to consider the fact that Dr. Glenn-Beatty's limitations support Plaintiff's

subjective limitations. However, as previously discussed substantial evidence supports the ALJ's findings that Dr. Glenn-Beatty's conclusion is inconsistent with the medical evidence of record.

Plaintiff next contends that the ALJ erred in assessing credibility by failing to specifically discuss "(1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." (Doc. 15, at 22 (citing *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994).) She asserts that the ALJ's summary of Plaintiff's medical records and statement that the evidence "is not strongly supportive of" plaintiff's allegations is insufficient to satisfy the above requirements. However the ALJ described the medical evidence in detail in the beginning of his decision. (Tr. 417-20.) Then in assessing her credibility he described the records in more general terms focusing on the lack of supporting evidence and the inconsistencies between Plaintiff's subjective complaints and the medical record. (Tr. 424-25.) For instance, he noted that there "were few significant complaints of serious bleeding, cracking, or pain associated with her" history of plantar and palm lesions, and concluded that this did not support the extent of Plaintiff's allegations of work-related difficulties. (Tr. 424.) In addition, he points out that although Plaintiff was diagnosed with fibromyalgia from February through April 2011, there is "no confirmation of the presence of the specific "tender points" associated with a confirmed diagnosis of fibromyalgia." (Tr. 419.) With regard to chronic joint pain, the ALJ points out that despite Plaintiff's complaints of pain she did not exhibit tenderness in

October 2009, December 2009, and March 2010; there was no reported swelling, redness or deformity noted; gait was minimally antalgic in 2009 but normal by March 2010; X-rays revealed no abnormalities; ANA testing was negative; and range of motion was not diminished. (Tr. 418.) Thus I suggest that the ALJ appropriately assessed whether objective medical evidence confirms the severity of Plaintiff's alleged pain.

Plaintiff further argues that the ALJ improperly considered Plaintiff's failure to obtain consistent treatment in violation of SSR 96-7p which requires the ALJ not to consider the Plaintiff's explanation for failure to seek treatment before drawing conclusions. (Doc. 15, at 23.) However, the ALJ satisfied this requirement by specifically noting that he "recognizes that the claimant has not apparently had insurance for some time." (Tr. 425.)

### 4.    Step Five Analysis

Finally, Plaintiff argues that substantial evidence does not support the ALJ's opinion that there is other work in the national economy that Plaintiff could perform because the ALJ failed to include the physical and mental limitations noted by Dr. Dickson, Dr. Glenn-Beatty, and Plaintiff in the hypothetical question posed to the Vocational Expert. (Doc. 15, at 24-25.) However, the ALJ was not required to include these in the hypothetical question because substantial evidence supports his findings that these limitations were not supported by the medical evidence as well as the ALJ's credibility assessment.

### H.    Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Dolder's Motion for Summary Judgment (Doc. 15) be **DENIED**, the Commissioner's Motion (Doc. 16) be **GRANTED**, and that this case be **AFFIRMED**.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1.) Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981.) The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987.) Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d.) The response must specifically address each issue raised in

the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: May 26, 2016                                S/ PATRICIA T. MORRIS
                                                  Patricia T. Morris
                                                  United States Magistrate Judge

## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: May 26, 2016                                By s/Kristen Krawczyk
                                                  Case Manager